UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| HENRY WOODS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10CV541 JAR |
| | ) | |
| MICHAEL BOWERSOX, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Henry Woods' Petition under 28 U.S.C. §2254

for Writ of Habeas Corpus By a Person in State Custody (ECF No. 1 ("Motion")).  Because this

Court has determined that Woods' claims are inadequate on their face and the record affirmatively

refutes the factual assertions upon which Woods' claims are based, this Court decides this matter

without an evidentiary hearing.[1]

## BACKGROUND

The Missouri Court of Appeals summarized the evidence regarding this case as follows:[2]

> On the evening of May 28, 2003, sometime after 9:00 p.m., Keith Wilson and
> William Robinson ("decedent") were drinking beer and wine at approximately 4200
> Natural Bridge in the City of St. Louis.  Wilson saw [Woods] and George Morning,
> whom he had earlier seen walking by, coming towards decedent and himself.

---

[1]"A district court does not err in dismissing a movant's motion without a hearing if (1) the movant's 'allegations, accepted as true, would not entitle' the movant to relief, or '(2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'"  Buster v. U.S., 447 F.3d 1130, 1132 (8th Cir. 2006) (quoting Sanders v. U.S., 341 F.3d 720, 722 (8th Cir. 2003)(citation and quotation marks omitted); Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (in a § 2254 case, holding that "[a] petitioner is not entitled to an evidentiary hearing . . . when his claims are . . . contentions that in the face of the record are wholly incredible.").

[2]The state court's factual findings are presumed to be correct, and Woods bears the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. §2254(e)(1).

[Woods] and Morning had guns visible as they approached the pair.  Earlier that same day Wilson had a confrontation with [Woods'] girlfriend and then with [Woods], who told Wilson to leave his girlfriend alone.

[Woods] and Morning opened fire on Wilson.  Wilson was struck in the face by a bullet as [Woods] and Morning approached him and the decedent.  Wilson ran off, but heard multiple shots as he fled.  After hiding for a time, he went home and told his brother that [Woods] had shot him.  Wilson thereafter went to the hospital for treatment of his injuries.  James Prichard, a police officer for Moline Acres, was doing security work for an Auto Zone store in the 4200 block of Natural Bridge on the evening of May 28, 2003.  He heard multiple gun shots, ran towards the sound and saw Robinson held up against a telephone pole on the corner of Natural Bridge and Harris by [Woods], who had a gun in one hand.  Prichard observed that Morning also had a gun.  He identified himself as a police officer, and ordered them to stop, but [Woods] and Morning fled the scene.

The police collected evidence from the scene, which included shell casings from two different weapons, and recovered two .45 caliber bullets from decedent's body.  Wilson identified both [Woods] and Morning from separate photo arrays, and later identified them in separate line-ups.

[Woods] was indicted for murder in the first degree in violation of section 565.020 RSMo (2000)[3], for armed criminal action in violation of section 571.015 in connection with Count I, for assault in the first degree in violation of section 565.050, and for armed criminal action in connection with Count III.  The indictment also charged that [Woods] was a prior offender.

[Woods] had a trial by jury from January 24, 2004 through January 26, 2004.  At the instruction conference, [Woods'] counsel made a general objection to the verdict directing instructions on the basis that they were not justified by the evidence.  Counsel for [Woods] did not make any specific objections to the verdict directing instructions.  The jury convicted [Woods] on all four counts.  The trial court sentenced [Woods] to life without the possibility of parole on Count I, and to three life sentences on Counts II, III, and IV, all sentences to run concurrently.

(Respondent's Exhibit E, pp. 2-3).  On March 7, 2006, the Missouri Court of Appeals affirmed Woods' convictions on direct appeal.  (Id., p. 8); State v. Woods, 188 S.W.3d 459 (Mo. Ct. App. 2006).  On May 19, 2009, the court also affirmed the denial of Woods' 29.15 motion for post conviction relief.  (Respondent's Exhibit L); Woods v. State, 298 S.W.3d 137 (Mo. Ct. App. 2009).

_____

[3]Unless noted otherwise, all further statutory citations are to RSMo (2000).

On March 29, 2010, Woods filed this Motion seeking relief based upon the following grounds:

(1)       the trial court committed plain error by giving Instruction No. 9, the verdict director for assault in the first degree, in that there was insufficient evidence to support that instruction;

(2)       the trial court committed plain error by giving Instruction No. 9 because there was a variance between the instruction and the indictment for first-degree assault;

(3)       trial counsel was ineffective because he had a conflict of interest that adversely affected his performance;

(4)       trial counsel was ineffective for failing to impeach the surviving victim with an inconsistent statement;

(5)       trial counsel was ineffective for not advising him of, and allowing him to exercise his right to testify; and

(6)       trial counsel was ineffective for failing to object when the State offered a theory of the crime that was different from the theory presented at his accomplice's trial.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2254, a district court "shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "[I]n a § 2254 habeas corpus proceeding, a federal court's review of alleged due process violations stemming from a state court conviction is narrow." Anderson v. Goeke, 44 F.3d 675, 679 (8th Cir. 1995). "[A]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

- 3 -

established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "'A state court's decision is contrary to … clearly established law if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if it confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision … and nevertheless arrives at a [different] result.'" Cagle v. Norris, 474 F.3d 1090, 1095 (8th Cir. 2007) (quoting Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003)). The Supreme Court has emphasized the phrase "Federal law, as determined by the Supreme Court," refers to "the holdings, as  opposed to the dicta, of this Court's decisions," and has cautioned that § 2254(d)(1) "restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Williams, 529 U.S. at 412. A State court "unreasonably applies" federal law when it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams v. Taylor, 529 U.S. 362, 407 (2000). A State court decision may be considered an unreasonable determination "only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record." Ryan v. Clarke, 387 F.3d 785, 791 (8th Cir. 2004) (citing 28 U.S.C. § 2254(e)(1)).

## DISCUSSION

## I.    Ground 1

In Ground 1, Woods contends that the trial court committed plain error by giving Instruction No. 9, the verdict director for assault in the first degree because he contends that there was insufficient evidence to support that instruction.  (Motion, p. 4).  Woods contends that there was insufficient evidence to support Instruction No. 9 because there was no evidence that George

Morning or another shot Keith Wilson as hypothesized in that instruction since all of the evidence suggested that Woods shot Wilson.

The Missouri Court of Appeals rejected Woods' claim as follows:

In his first point relied on, [Woods] requests that this Court engage in plain error review, contending that the trial court committed plain error in giving Instruction No. 9, the verdict director for assault in the first degree, and in accepting the jury's verdict of guilty on that charge, in that there was insufficient evidence to support that instruction "because there was no evidence that George Morning or 'another' shot Keith Wilson as hypothesized in that instruction since all of the evidence suggests that [Woods] shot Wilson."

The written version of Instruction No. 9 contained in the legal file reads, in part, as follows:

As to Count III, if you find and believe from the evidence beyond a reasonable doubt:

First, that on May 28, 2003, in the City of St. Louis, State of Missouri, another person knowingly caused serious physical injury to Keith Wilson by shooting him,
then you are instructed that the offense of assault in the first degree has occurred ...

This version of the instruction omits some key words. It should have read "the defendant or another person knowingly caused serious physical injury to Keith Wilson by shooting him[.]" As originally written, Instruction No. 9 indicates that the jury would have to find that another person shot Wilson in order to find [Woods] guilty of Count III, first degree assault. However, the State noticed this omission just after the trial court read the instructions to the jury, and the State brought it to the attention of the trial court prior to the arguments of counsel and the submission of the case to the jury. This led the trial court to make the following statement to the jury:

Ladies and Gentlemen, at this time, the court will re-read Instruction 9. You will note that when you get to Instruction 9, I have added to the first paragraph the following words: "the defendant or." I will re-read the instruction in its entirety at this time.

The record reflects that the trial court did re-read that instruction to the jury. [Woods'] brief fails to mention that the trial court took this corrective measure, which properly instructed the jury on this matter. The trial court may correct an instruction and it is the duty of the trial court to do so, "at any time during the trial, especially before the case has been submitted, if upon reflection the same is considered to have been erroneously given." State v. Sawyer, 367 S.W.2d 585, 588

(Mo. 1963).  In <u>Sawyer</u>, the Missouri Supreme Court found no error where the trial court corrected the defective instruction during the reading of the instruction to the jury, prior to the argument of counsel and final submission of the case to the jury, much like the present case.  Under the factual circumstances of this case, the alleged error regarding Instruction No. 9 does not rise to the level of manifest injustice.  Point denied.

(Respondent's Exhibit E, pp. 4-5).

To warrant federal habeas relief, Woods must establish not only that the instruction is erroneous, "'but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.'" <u>Beets v. Iowa Dep't of Corrs. Servs.</u>, 164 F.3d 1131, 1134 (8th Cir.1999) (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 146 (1973)). "Habeas corpus relief may be granted only when an erroneous jury instruction constituted 'a fundamental defect' that resulted 'in a complete miscarriage of justice, [or] an omission inconsistent with rudimentary demands of a fair trial.'" <u>Louisell v. Dir. of Iowa Dep't of Corrs.</u>, 178 F.3d 1019, 1022 (8th Cir.1999) (quoting <u>Crump v. Caspari</u>, 116 F.3d 326, 327 (8th Cir.1997)).  Here, the claimed error was clearly harmless as it was corrected almost immediately and prior to the jury beginning deliberations.  <u>See</u> Respondent's Exhibit E, p. 5; Respondent's Exhibit D, pp. 434-35; <u>State v. Sawyer</u>, 367 S.W.2d 585, 588 (Mo. 1963); <u>Carson v. Dir. of Iowa Dept. of Corr. Services</u>, 150 F.3d 973, 976 (8th Cir. 1998)(even if petitioner's claims of instructional error rose to the level of constitutional violations, they cannot be the basis for habeas relief if they are harmless);  <u>Seiler v. Thalacker</u>, 101 F.3d 536, 539 (8th Cir.1996)(same).  Before the jury received the case, the trial court was made aware of the improper instruction.  The Court re-read the corrected Instruction No. 9, which permitted the jury to find that Woods or another shot Keith Wilson.  (Respondent's Exhibit E, p. 5; Respondent's Exhibit D, pp. 434-35).  Because the trial court took this corrective measure, there was no instructional error.  Accordingly, the Missouri Court of Appeals' decision was not contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States nor was the

- 6 -

decision based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  Woods' first point is denied.

## II.    Ground 2

In Ground 2, Woods contends that the trial court erred in giving Instruction No. 9 of the verdict director for assault in the first degree and accepting the jury's verdict of guilty because it violated Woods' right to due process, his right to a fair trial and to be convicted only of the crime charged.  (Motion, pp. 4-5).  That is, the Indictment charged Woods with a Class A felony of assault by attempting to kill or cause serious physical injury to Keith Wilson, but Instruction No. 9 instructed the jury that Woods was guilty of assault in the first degree if they found that another person knowingly caused physical injury to Keith Wilson by shooting him.  (Id.).  Woods contends that this constitutes a fatal variance from the offense charged and gave [Woods] no notice that the jury would be instructed on this method of committing the class A felony of assault.  (Id.).

The Missouri Court of Appeals rejected Woods' argument regarding Instruction No. 9 as follows:

> In his second point relied on, [Woods] also requests plain error review, arguing that the trial court plainly erred in giving Instruction No. 9 and in accepting that jury's verdict of guilty on that count in that there was a fatal variance between the indictment charging him with assault in the first degree and Instruction No. 9, giving him no notice that the jury would be instructed on a different method of committing assault in the first degree and thereby violating his right to due process.
>
> Count III of the indictment that charged [Woods] with assault in the first degree reads as follows:
>
>> The Grand Jurors of the City of St. Louis, State of Missouri, charge that the defendant, acting with George Morning, in violation of Section 565.050, RSMo, committed the class A felony of assault in the first degree, punishable upon conviction under Section 558.011, RSMo, in that on or about May 28, 2003, in the City of St. Louis, State of Missouri, the defendant, acting with George Morning shot Keith Wilson and such conduct was a substantial step toward the commission of the crime of attempting to kill or cause serious physical injury to Keith Wilson, and was done for the purpose of

committing such assault, and in the course thereof inflicted serious injury on Keith Wilson.

There are two options in charging first degree assault as a class A felony. One option uses the allegation "knowingly caused serious physical injury to [the victim]" and the second option is to use the allegation "attempted to (kill) (or) (cause serious physical injury to) by ... and in the course thereof inflicted serious physical injury on [the victim]." If the first option is used, the jury should be instructed using MAI-CR 3d 319.02, and if the second option is used, the jury should be instructed using MAI-CR 3d 219.06. The indictment for Count III, first degree assault, uses the second option, but Instruction No. 9 uses the language of MAI-CR 3d 319.02, in addition to omitting the words "the defendant or" as previously noted in our discussion of [Woods'] first point relied on. The State concedes that there is a variance, but asserts that it is not a fatal variance.

A variance is not fatal and does not require reversal unless it submits a new, distinct offense from that with which the defendant was charged. State v. Glass, 136 S.W.3d 496, 520 (Mo. banc 2004)(quoting State v. Clark, 782 S.W. 2d 105, 108 (Mo. App. 1989)). Instructing on one form of the offense where the information or indictment charges another form of the same offense is not reversible error absent a showing that the variance is both material and prejudicial to the defendant. See State v. Williams, 18 S.W.3d 461, 469 (Mo. App. 2000). To warrant reversal, the variance must be material and prejudice to the defendant. Glass, S.W. 3d at 520. A variance is material when it affects whether the accused received adequate notice; a variance is prejudicial when it affects a defendant's ability to defend himself against the charge. Id. There is no actual prejudice where the defense at trial, if believed by the jury, is adequate to disprove both the charges in the information/indictment and the charges in the instruction. See State v. Madison, 997 S.W. 2d 16, 19 (Mo. banc 1997).

This case is similar to Williams, 18 S.W.3d 461. In Williams, the defendant was charged in the information with the class A felony of assault in the first degree, which required a finding that the victim sustained a serious physical injury. However, the jury instruction submitted the assault charge as a class B felony, which required the jury find that the defendant or another attempted to kill or cause serious physical injury to the victim. Id. at 468. This Court noted in that case that the information notified the defendant that he would face a charge of shooting the victim and the instruction also submitted an offense based on the shooting of the victim. Id. at 469. This Court held that the instruction did the affect whether the defendant in Williams received adequate notice of the charge against him. Id. Similarly in the present case the indictment informed [Woods] that he would face a charge of acting with another in shooting Wilson and inflicting serious physical injury on him. Instruction No. 9, as corrected by the trial court submitted a charge based on the shooting of Wilson by [Woods] or another person acting with [Woods]. Accordingly the variance was not material.

- 8 -

      Assuming *arguendo*, that the variance between the indictment and Instruction No. 9 was material, it was not prejudicial to the defense presented by [Woods], and does not rise to the level of manifest injustice required for plain error to be reversible.  The crux of the defense offered by [Woods] was to cast doubt on the credibility and accuracy of Wilson's testimony and identification of [Woods] as one of his assailants, asserting that [Woods] did not commit the crimes.  As in the case of <u>Williams</u>, in which the defendant denied any involvement in the assault, "it is difficult to see how this defense would have changed" based upon the variance between the indictment and the instruction at issue.  <u>Id.</u>  Further, a variance between a charge and the instruction is not prejudicial where there is evidence that supports the allegations in the indictment and those contained in the instruction.  <u>See</u> <u>State v. Johnson</u>, 606 S.W.2d 655, 656-57 (Mo. banc 1980); <u>State v. Davis</u>, 684 S.W.2d 38, 39-40 (Mo. App. 1984); State v. Collins, 519 S.W. 2d 362, 363-64 (Mo. App. 1975).  There is no prejudice and no manifest injustice.  Point denied.

(Respondent's Exhibit E, pp. 5-7).

"'[A] person's [sixth amendment] right to reasonable notice of the charge against him ... is incorporated in the Fourteenth Amendment to the United States Constitution and thus cannot be abridged by the states.'" <u>Franklin v. White</u>, 803 F.2d 416, 417 (8th Cir. 1986)(quoting <u>Goodloe v. Parratt</u>, 605 F.2d 1041, 1045 (8th Cir.1979)).  Fair notice due process claims are cognizable in habeas corpus. <u>Franklin</u>, 803 F.2d 416, 417; <u>Goodloe</u>, 605 F.2d at 1045 n.12.  Therefore, a court cannot permit a defendant to be tried on charges that are not made in the indictment against him. <u>Stirone v. U. S.</u>, 361 U.S. 212, 217, 80 S. Ct. 270, 273, 4 L. Ed. 2d 252 (1960).  However, not all variances between the charge and the verdict director are fatal.

Respondent argues that the variance present here is a simple, not fatal variance, and the Petitioner's case was not prejudiced in any way.  "Convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment." <u>United States v. Miller</u>, 471 U.S. 130, 136, 105 S. Ct. 1811, 1815, 85 L. Ed. 2d 99 (1985). In contrast, "[f]or a variance to be fatal, *i.e.*, requiring reversal, the instruction must submit a new and distinct offense from that charged in the information." <u>State v. McCullum</u>, 63 S.W.3d 242, 252 (Mo. Ct. App. 2001). In determining if a variance is fatal, "[a]s a general rule, 'it is

necessary to determine whether the variance between the information and instruction was material and whether the variance prejudiced the substantial rights of the defendant....' " State v. Condict, 65 S.W.3d 6, 16 (Mo.App.2001) (quoting State v. Lee, 841 S.W.2d 648, 651 (Mo. banc 1992)).  The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense. Berger v. United States, 295 U.S. 78, 82, 55 S. Ct. 629, 630, 79 L. Ed. 1314 (1935)(citations omitted); see also Hayes v. United States, 329 F.2d 209, 216 (8th Cir. 1964)

The Court finds that the Missouri Court of Appeals did not unreasonably apply United States Supreme Court precedent when it rejected Woods' variance claim.  The indictment and the verdict director both explained that the assault charge was based upon the shooting of Keith Wilson, which caused him serious physical injury.  (Respondent's Exhibit C, pp. 9, 20; Respondent's Exhibit D, p. 434).  The Court finds that no fatal variance resulted from the difference between whether Woods, or his accomplice, (1) knowingly caused serious physical injury to Wilson by shooting him, or (2) attempted to kill or cause serious physical injury to Wilson by shooting him and, in the course thereof, inflicted serious physical injury.  (Id.).  Woods knew he was accused of shooting Wilson and causing him serious physical injury.  His only defense to the charge was that he was not involved and that the State's witnesses lacked credibility.  Respondent's Exhibit D, pp. 402-05, 452, 454-55, 457; Respondent's Exhibit E, p. 8; see United States v. Mohamed, 600 F.3d 1000, 1006 (8th Cir. 2010)("The indictment fully and fairly apprised him of the charges against him, despite the alleged variance, and therefore there was no actual prejudice to Mohamed.").  Woods "does not claim the variance in this case affected his trial strategy or otherwise prejudiced his defense." State v. Lemons, 294 S.W.3d 65, 72 (Mo. Ct. App. 2009); State v. Goss, 259 S.W.3d 625, 627–28 (Mo.

Ct. App. 2008). Thus, Woods cannot demonstrate that his rights were substantially affected by the simple variance in the instruction.

The Court finds that the variance was not fatal because it did not submit a new, separate and distinct offense from the one charged in the indictment. State v. King, 747 S.W.2d 264, 275 (Mo. Ct. App. 1988). Accordingly, the Court finds that the Missouri Court of Appeals properly rejected this claim and did not misapply federal law.

## III.    Grounds 3 and 4

### A.    Legal Standard for Ineffective Assistance of Counsel

To support an ineffective assistance of counsel claim, a convicted movant must first show "that his counsel's performance was deficient, and that he suffered prejudice as a result." Paul v. United States, 534 F.3d 832, 836 (8th Cir. 2008) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). The movant must also establish prejudice by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; Malcom v. Houston, 518 F.3d 624, 626 (8th Cir. 2008). A reasonable probability is less than "more likely than not," Kyles v. Whitley, 514 U.S. 419, 434 (1995), but more than a possibility. White v. Roper, 416 F.3d 728, 732 (8th Cir. 2005). A reasonable probability "is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "The applicable law here is well-established: post-conviction relief will not be granted on a claim of ineffective assistance of trial counsel unless the petitioner can show not only that counsel's performance was deficient but also that such deficient performance prejudiced his defense." United States v. Ledezma-Rodriguez, 423 F.3d 830, 836 (8th Cir. 2005) (citations omitted).

### B.    Discussion

In Ground 3, Woods contends that trial counsel was ineffective because he had a conflict of interest that adversely affected his performance. (Motion, p. 11). Trial counsel directed Woods to

arrange for Keith Wilson to sign an affidavit, written by counsel, recanting his identification of Woods, which the State viewed as victim tampering. (Id.). Woods claims that counsel's involvement with the affidavit adversely affected his performance at trial by affecting his judgment and trial strategy relating to the use of the affidavit and Woods' testimony at trial. (Id.). In Ground 4, Woods claims that he was denied effective assistance of counsel because counsel failed to utilize evidence of Keith Wilson's prior inconsistent statement, under oath, that Woods was innocent of the charged crimes. (Motion, p. 12). Woods maintains that he was prejudiced because had counsel used the affidavit at trial, then there is a reasonable probability that the outcome of the trial would have been different. (Id.).

In this case, the Missouri Court of Appeals determined that Woods failed to meet the Strickland standard. The Court of Appeals rejected Woods' ineffective assistance of counsel claim as follows:

> Movant's co-defendant Morning went to trial before [Woods]. Morning's counsel asked for a pre-trial ruling concerning the admissibility as a prior inconsistent statement an affidavit signed by Wilson. During pre-trial examination, the court questioned Wilson regarding an affidavit he had signed, which stated that Wilson incorrectly identified [Woods] as the man who shot him. Wilson testified that [Woods] approached him with the document and asked him to sign it. Wilson stated that he did not "really read" the document before he signed it. During argument concerning the use of the affidavit as a prior inconsistent statement to impeach Wilson's identification of his assailants, the State asserted that the affidavit was a product of witness tampering by [Woods] while indicted for murder and on bond. After hearing argument from the State and Morning, the Court stated:
>
> > ... I find this to be an abomination. The witness before us is a person that went to special school district, vocabulary in here is beyond the pale of his understanding.
> >
> > He said he didn't read it. The position of the defense is preserved. I deem [the affidavit] a coerced document by a co-defendant in a first degree murder case. I don't believe it has an indicia of reliability to consider by the jury. I don't believe it's a statement of Mr. Wilson. It will be preserved and the timely motion by the defense to use it will be overruled.

Officer James Prichard (Officer Prichard) testified at Morning's trial. As pertinent to the issues on appeal, Officer Prichard testified that while working a secondary job at an Auto Zone at the intersection of Natural Bridge and Harris Avenue on the evening of May 28, 2003, he heard a series of nine gunshots being fired outside the store. After hearing the shots, he exited the Auto Zone to determine what was occurring. Officer Prichard saw three individuals at the streets' intersection, a victim and two men holding guns. The victim was being held up against a telephone pole by the taller of the two individuals, who has his gun approximately six to eight inches away from the victim's face. The shorter individual was standing approximately five to eight feet away from the victim.

[...]

Officer Prichard also testified at [Woods'] trial, and stated that when he arrived on the scene of the shooting, he saw victim Robinson being held up against a telephone pole by the taller of the two individuals. Prichard further stated he did not see a weapon in the victim's hand, but that both of the other two individuals were holding guns. When Officer Prichard announced his presence as a police officer, both assailants ran. Officer Prichard immediately went to check on the victim and discovered that the victim had been shot numerous times in the face and chest.

The assault victim, Wilson, was a witness for the State during [Woods'] jury trial and testified as follows. Wilson, who was thirty-years-old, had trouble learning when he was a student and had attended a special school; he last attended school in the eleventh grade. He cannot hold a job and receives a disability check.

Wilson had known victim Robinson and [Woods] (whom he knew as "Light") for years before the shooting occurred. [Woods] lived near Wilson and drove a scooter.

On May 28, 2003, [Woods'] girlfriend tried to run over Wilson's feet with [Woods'] scooter. Wilson asked her why she tried to run over him. [Woods'] girlfriend was "angry a little bit." Later that same morning, [Woods] drove up to Wilson on the same scooter and told Wilson to leave his girlfriend alone.

That evening, Wilson met up with Robinson and they bought something to drink at the liquor store on Natural Bridge. Wilson bought a thirty-two ounce Miller and Robinson bought a fifth of Cisco. Wilson and Robinson walked to a hair shop farther down on Natural Bridge to sit. While they were sitting next to the hair shop, Wilson saw someone coming up Harris Street. Wilson recognized him because he had seen this person with [Woods] before. The person looped towards Wilson and then left the same way he came. Wilson moved closer to the corner of the street and saw this person, whom he recognized and later learned was named George Morning, again approaching, this time accompanied by [Woods]. [Woods] is taller than Morning. Both men had guns. Wilson and Robinson were standing together near a pole.

- 13 -

After the two men got close to Wilson, they shot him. A shot hit Wilson in the left side of his mouth. After Wilson was shot, he ran across the street to the liquor store. He heard more shots as he ran into the street. Wilson ran into the liquor store and asked for some help. He stayed there for a little bit, but then ran out and went home. When he got home, he told his brother that [Woods] had shot him.

Wilson then went to the hospital, where he was treated for a broken bone on the right side of his face. He lost four or five teeth and part of his tongue as a result of the shooting. Police officers visited Wilson while he was in the hospital, and they asked him about the incident. Wilson gave them [Woods'] name as his shooter, and when police officers came by with a series of photographs, Wilson picked out [Woods'] picture.

After his release from the hospital, Wilson went to a police station and looked at a live lineup on June 19, 2003. He picked out [Woods] and identified him as his assailant. Wilson again viewed a lineup on August 4, 2003, and identified George Morning as the other person involved in the shooting.

On cross examination, Wilson agreed that he had been receiving a disability check for mental problems for many years and stated that he could "read a little bit." Wilson admitted that he and Robinson had been drinking the Cisco wine before the shooting and that it was very dark outside, but insisted that he was sober and remembered exactly how everything looked that evening. Wilson admitted that when he talked to the police right after he was shot, he told them that he had spoken to [Woods'] girlfriend the morning of the shooting, she had ignored him and he had told her she had a bad attitude. Wilson also agreed he told police that after Wilson's confrontation with [Woods'] girlfriend, [Woods] came to him and threatened him. When [Woods'] trial counsel pointed out that Wilson did not tell him about an argument between Wilson and the girlfriend when trial counsel took his deposition before trial, Wilson agreed that he had not mentioned it.

[...]

In his amended Motion to Vacate, Set Aside or Correct Judgment and Sentence filed pursuant to Rule 29.15, [Woods] alleged, among other things, that his trial counsel's involvement in composing an affidavit for the alleged assault victim Wilson to sign and in encouraging [Woods] to have contact with Wilson to procure his signature created an actual conflict of interest between [Woods] and his trial attorney that made impartial advice and representation impossible due to the fact that the State viewed this conduct as the crime of witness tampering.

According to [Woods'] trial counsel's testimony at the evidentiary hearing, on July 24, 2004, [Woods] informed him that Wilson had recently visited [Woods] at his home, where the topic of the shooting arose. In response to [Woods'] remark that he would never do such a thing, Wilson stated that he did not believe he correctly identified [Woods] and was positive that [Woods] had not been his assailant. Someone from trial counsel's office drafted an affidavit for [Woods] and

- 14 -

his co-defendant. [Woods'] trial counsel did not want contact with Wilson because he was a witness and told [Woods] that, if Wilson voluntarily wanted to sign the affidavit, Wilson could take it to a notary.

Thereafter, [Woods'] trial counsel and trial counsel for co-defendant Morning deposed Wilson, at which time Wilson identified [Woods] as his assailant. During the deposition, [Woods'] trial counsel produced Wilson's affidavit. [Woods'] trial counsel recalled that, after he produced the affidavit, the State asserted that [Woods'] bond could be revoked or he could be charged with intimidating a witness or victim tampering. [Woods'] trial counsel discussed the State's reaction with [Woods], and explained the consequences of using the affidavit at trial, including the possibility of [Woods] being taken off bond and additional charges being filed against him. Trial counsel also advised [Woods] that, as long as the circumstances surrounding the procurement of Wilson's signature were as [Woods] portrayed, trial counsel did not believe they constituted witness tampering. [Woods'] trial counsel left the decision up to [Woods], who directed his trial counsel to make no further use of the affidavit. Although trial counsel thought the jury might associate some impropriety with the procuring of the affidavit, trial counsel did not view [Woods'] actions as tampering and was not concerned for himself.

During the evidentiary hearing, [Woods] testified that his trial counsel never discussed the issue of victim tampering with him and he thought his counsel was going to use the affidavit. After stating that he "didn't know nothing about victim tampering until actually [post-conviction counsel] came to be my lawyer [she] did the research," [Woods] claimed that when he had asked his trial counsel after the guilty verdict why he had not used the affidavit, his counsel told him he had not because the State could have charged him with witness tampering.

[Woods'] trial counsel opined that the affidavit could "cut both ways. That affidavit could be viewed askance by a jury or it could be viewed as substantial impeachment by a jury." [Woods'] trial counsel thought the possible appearance of impropriety could lead the jury to form a negative inference concerning [Woods] and his guilt.

[Woods] claimed that he had wanted to testify at his trial, but that his counsel had told him that he would withdraw should [Woods] do so. [Woods] denied that he knew he had a right to testify, even though he had pleaded guilty to a drug possession charge several years prior. However, [Woods'] counsel testified that he absolutely informed [Woods] that he had a right to testify.

In its Findings of Fact, Conclusions of Law and Order, the motion court concluded that [Woods] had failed to establish facts, which if true, would entitle him to relief. As to the affidavit, the motion court concluded there was no persuasive evidence presented that indicated that [Woods] approached Wilson and improperly persuaded him to execute the affidavit and that [Woods] had not established that the reason trial counsel decided not to use the affidavit was due to a concern about trial counsel's exposure to discipline or prosecution, as opposed to reasonable trial strategy.

[...]

Due to the interrelatedness of the points, we shall address [Woods'] first and second points conjointly.  In his first point, [Woods] claims that the motion court clearly erred in denying his motion for post-conviction relief because his trial counsel directed him to arrange for Wilson to sign an affidavit prepared by counsel, whereby Wilson recanted his identification of [Woods] as his assailant. [Woods] asserts that because the State viewed this activity as victim tampering, counsel's involvement with the affidavit adversely affected counsel's performance at trial by affecting his judgment and trial strategy relating to the use of the affidavit and [Woods'] testimony at trial.  In his second point, [Woods] claims that counsel's unreasonable failure to use the affidavit at trial as evidence of a prior inconsistent statement under oath that [Woods] was innocent of the charged crimes prejudiced [Woods] because there is a reasonable probability that the trial's outcome would have been different.

To prevail on an ineffective assistance claim based on counsel's conflict of interest, absent an objection at trial, a movant must demonstrate that an actual conflict of interest adversely impacted his counsel's performance.  Mickens v. Taylor, 535 U.S. 162, 173 (2002); Helming v. State, 42 S.W. 3d 658, 680 (Mo. App. E.D. 2001).  Thus, counsel must have done something, or refrained from doing something, which was detrimental to the movant's interests and advantageous to the interest of another.  Helming, 42 S.W. 3d at 680; State v. Taylor, 1 S.W. 3d 610, 611-12 (Mo. App. W.D. 1999).

We conclude that [Woods] has failed to show that a conflict of interest actually affected the adequacy of his representation.  Cuyler v. Sullivan, 446 U.S. 335, 349-50 (1980).  Importantly, [Woods] failed to demonstrate that counsel's failure to use the affidavit was detrimental to [Woods'] interests.

The affidavit, notarized on October 19, 2004, states, in pertinent part:

COMES NOW, Keith Wilson, who swears to and submits the following:

1.      I, Keith Wilson, testify that I incorrectly identified defendant Henry Woods in the course of police interrogation in the above-stated cause; and

2.      Based on the above incorrect identification and with my absolute certainty, I now assert that the assailant in the above-stated cause could not have been and was not the defendant, Henry Woods.

The evidence demonstrates that, aside from the affidavit, Wilson was consistent in his identification of [Woods] as his assailant.  Immediately after the shooting, Wilson told his brother that [Woods], whom Wilson had known for years, shot him.  Shortly thereafter, Wilson relayed this same information to the police officers at the hospital.  While still confined in the hospital for his injuries, Wilson

- 16 -

identified [Woods] as his assailant when presented with a series of photographs. After being released from the hospital, Wilson picked [Woods] out from a lineup. As well, Wilson testified at his deposition and at [Woods'] trial that [Woods] shot him.

Additionally, although Wilson may have signed the affidavit voluntarily, the record demonstrates that Wilson suffers from a mental disability to such an extent that he attended a special school as a student and had only a limited ability to read. Presumably, if presented with the affidavit, Wilson would have replied that he did not know what the affidavit said when he signed it, just as he did during the offer of proof when Morning's trial counsel attempted to introduce the affidavit. Thus, trial counsel's concern that the "affidavit could be viewed askance by a jury" was a valid one. Given the overwhelming number of positive identifications by Wilson immediately following the shooting and Wilson's limited mental capability, the reliability of the affidavit, signed over a year later, is questionable, and thus we cannot say that trial counsel's decision to not use the affidavit as a prior inconsistent statement was an unreasonable choice of trial strategy. State v. Boyd, 913 S.W. 2d 838, 845 (Mo. App. E.D. 1995)(counsel is vested with wide latitude in defending client, using his best judgment in matters relating to trial strategy); Berry v. State, 714 S.W. 2d 676, 678 (Mo. App. E.D. 1986)(decision whether to impeach witness with prior inconsistent statement is matter of trial strategy accompanied by strong presumption of correctness).

As to [Woods'] contention that his trial counsel's failure to use the affidavit was prompted by a concern about his own exposure to discipline or prosecution due to his involvement in composing the affidavit, [Woods'] trial counsel testified that, after relaying to [Woods] the State's expressed view of the affidavit and its threatened action, counsel left the decision concerning the affidavit up to [Woods], who instructed him not to use it. Not only did trial counsel indicate that he did not view [Woods'] actions as witness tampering, but he also denied that he had any concern regarding his involvement with the affidavit. We find no clear error in the motion court's conclusions that [Woods] failed to establish that the reason for his trial counsel's decision not to use the affidavit was a concern for his own interests, or that the outcome of his trial would have been different had his counsel not composed the affidavit. Helming, 42 S.W. 3d at 680; Rousan v. State, 48 S.W. 3d 576, 585 (Mo. banc 2001)(motion court entitled to disbelieve movant's testimony and to believe counsel's testimony); State v. Hamilton, 892 S.W. 2d 371, 377 (Mo. App. E.D. 1995)(deference to lower court's credibility determinations).

(Respondent's Exhibit L, pp. 2-14).

The Court finds that the Missouri Court of Appeals' rejection of Woods' ineffective assistance of counsel claim based upon a purported conflict of interest was reasonable and did not misapply federal law.  If a petitioner cannot show an adverse impact under Cuyler, "he is

necessarily unable to prove prejudice under the more rigorous <u>Strickland</u> standard typically

governing ineffective assistance claims." <u>Winfield v. Roper</u>, 460 F.3d 1026, 1040 (8th Cir.

2006).  The Eighth Circuit has stated that:

> Under <u>Cuyler</u> a defendant is required to show an actual conflict of interest that
> adversely affected his defense. 446 U.S. at 348, 100 S.Ct. 1708. To be successful
> [petitioner] would have to identify an actual and demonstrable adverse effect, "not
> merely an abstract or theoretical one." <u>United States v. Flynn</u>, 87 F.3d 996, 1001 (8th
> Cir., 1996). To establish that there was a conflict in representation, the defendant
> must show "that the conflict caused the attorney's choice" to engage or not to engage
> in particular conduct. [<u>Covey v. United States</u>, 377 F.3d 903, 908 (8th Cir. 2004)]
> quoting <u>McFarland v. Yukins</u>, 356 F.3d 688, 705 (6th Cir.2004)). Such a showing
> requires the defendant to "identify a plausible alternative defense strategy or tactic
> that defense counsel might have pursued,' "'show that the alternative strategy was
> objectively reasonable under the facts of the case," and "establish that the defense
> counsel's failure to pursue that strategy or tactic was linked to the actual conflict."
> <u>Covey</u>, 377 F.3d at 908 (citing <u>Mickens v. Taylor</u>, 240 F.3d 348, 361 (4th Cir.2001)
> (en banc), <u>aff'd</u> 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002)).

<u>Winfield</u>, 460 F.3d at 1039.

In this case, Woods fails to show that counsel's interests conflicted with his own.  Counsel's

only role in the creation of the affidavit was to have his secretary draft it and give it to Woods for

Wilson to sign.  (Respondent's Exhibit K, pp. 22-25, 51).  Counsel had no reason to believe that the

affidavit contained false information or that Wilson would not knowingly or voluntarily sign it.  (<u>Id.</u>,

pp. 40-41, 44, 51).  It was only later at Wilson's deposition that counsel learned that Wilson was

unaware of the contents of the affidavit when he signed it, and that Wilson remained steadfast in his

belief that Woods was one of his assailants.  (<u>Id.</u>, p. 45).  Counsel instructed Woods that, as long as

Woods correctly portrayed the manner in which he procured the affidavit, then the affidavit was

proper and it could be used at trial.  (<u>Id.</u>, pp. 34, 46-47).  Woods, however, then directed his counsel

not to use the affidavit.  (<u>Id.</u>, pp. 33, 50-51).

In addition, defense counsel testified that he had no concerns that he would face

repercussions for having the affidavit drafted. (Respondent's Exhibit K, p. 52). The post-conviction

court also found no impropriety in counsel's involvement in the affidavit. (Respondent's Exhibit I, p. 56). Woods, however, fails to prove the existence of an actual conflict of interest because he has not shown that counsel's role in drafting the affidavit was contrary to Woods' interests. In fact, Woods, not counsel, decided to not to use the affidavit at trial. (Respondent's Exhibit K, pp. 33, 50-51).

Further, the Court agrees with the Respondent that Woods' claim that his counsel was ineffective for not using the affidavit to impeach Wilson lacks merit. See ECF No. 9, p. 28. Counsel believed that impeaching Wilson with the affidavit would have been more detrimental than beneficial to Woods' case because of the circumstances surrounding obtaining the affidavit. (Respondent's Exhibit K, pp. 34-35). Counsel explained that Wilson's mental disability would have prevented him from understanding the affidavit and would give the jury an impression that Woods had coerced Wilson into signing it. (Id., pp. 47-49). Further, Counsel noted that Wilson had directly refuted the affidavit during his deposition. (Id., p. 45). After discussing this with him, Woods decided not to use the affidavit at trial. (Id., pp. 48-49). Thus, defense counsel was not ineffective for failing to use the affidavit at trial because it was reasonable trial strategy. The affidavit lacked credibility and the jury likely would have found that Woods took advantage of mentally-disabled Wilson. See Hall v. Luebbers, 296 F.3d 685, 694 (8th Cir. 2002)("counsel's decision not to use the videotaped statement was a strategic decision based on an evaluation that more harm than benefit would come from its use at trial"); Mason v. Dormire, 4:06CV1786 CDP, 2009 WL 1684713, at *8 (E.D. Mo. June 16, 2009)("trial counsel could have also decided that impeaching [the victim] would have caused more harm than benefit"). Consequently, the Court finds that the Missouri Court of Appeals' decision was not contrary to clearly established federal law or based on an unreasonable determination of the facts in light of the evidence presented. See Strickland, 466 U.S. at 690.

**IV.   Ground 5**

Woods claims that trial counsel was ineffective for not advising him of and allowing him to exercise his right to testify. (Motion, p 13). Woods claims that if he had been allowed to testify then the outcome of the trial would have been different. (Id.).

The Missouri Court of Appeals rejected Woods' claim as follows:

> [Woods'] testimony and his trial counsel's testimony differ as to whether trial counsel informed [Woods] of his constitutional right to testify and whether he prevented [Woods] from testifying. Although [Woods] claimed that he did not know he had the right to testify, his trial counsel stated he "absolutely" informed [Woods] that he had that right. After hearing this testimony, the motion court specifically found [Woods'] claims to not be credible. The motion court is entitled to disbelieve [Woods'] testimony, and we defer to that finding. Rousan, 48 S.W. 3d at 585; Hamilton, 892 S.W. 2d at 377. We find no clear error. Rule 29.15(k).

Respondent's Exhibit L at 14-15.

The Court finds that the Missouri Court of Appeals' decision was reasonable in light of the evidence presented. Counsel testified at the post-conviction evidentiary hearing that he "absolutely" informed Woods of his right to testify at trial. (Respondent's Exhibit K, p. 38). The post-conviction court determined that Woods' testimony that he had not been so informed lacked credibility. (Respondent's Exhibit K, p. 38; Respondent's Exhibit I, p. 57). The post-conviction court, which was also the trial court, was in the best position to assess the credibility of Woods' contention that counsel prevented him from testifying. See Bonich v. Denney, 12-3227-CV-S-ODS-P, 2012 WL 5472031, at *3 (W.D. Mo. Nov. 9, 2012), citing Graham v. Solem, 728 F.2d 1533, 1540 (8th Cir. en banc 1984)("Credibility determinations are left for the state court to decide."). "Federal habeas review 'gives federal courts no license to redetermine [the] credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'" Perry v. Kemna, 356 F.3d 880, 885 (8th Cir. 2004)(quoting Marshall v. Lonberger, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983)). Nothing in the record suggests that the state court erred

- 20 -

in its determination of credibility.  <u>Winfield v. Roper</u>, 460 F.3d 1026, 1035 (8th Cir. 2006).

Accordingly, the Court finds that Woods' fifth ground lacks merit and is denied.

**V.      Ground 6**

Woods asserts that his counsel was ineffective for failing to object to the fact that the State used inconsistent theories at Woods' trial and the trial of Woods' co-defendant, Morning. (Motion, p. 14).  The State argued at Woods' trial that he was Robinson's killer, but argued at his co-defendant's trial that the co-defendant was Robinson's killer.  (<u>Id.</u>).  Woods maintains that he was prejudiced by his counsel's failure to object accordingly.

Woods' accomplice, George Morning, was charged under accomplice liability for the murder of William Robinson.  (Respondent's Exhibit J, p. 11).  James Prichard, a police officer near the scene, testified at Morning's trial that he responded to gunshots.  (Respondent's Exhibit J/Transcript, p. 198).  Officer Prichard saw three people at the scene.  (<u>Id.</u>, p. 202).  The victim (Robinson) was against a utility pole.  (<u>Id.</u>).  The taller suspect was holding Robinson up and holding a gun six to eight inches from his face.  (<u>Id.</u>, p. 203).  The shorter suspect was standing five to eight feet away and holding a gun.  (<u>Id.</u>, pp. 203, 205).   Officer Prichard did not see any shots fired. (<u>Id.</u>, p. 204).  He never specifically identified the two suspects.

During the prosecutor's closing argument at Morning's trial, the prosecutor discussed whether Morning or another person knew or was aware that Morning's conduct would cause Robinson's death:

> You can't shoot somebody here and here and not know that you're practically certain to cause his death.  And we know from this circumstance from Officer Prichard that before William Robinson collapsed the smaller of the two guys had him up against the [l]ight pole looking like he was holding him and letting him drop. You heard that testimony.

(Respondent's Exhibit J/Transcript, p. 504).  The prosecutor argued that under accomplice liability, it made no difference which person shot Robinson.  (Id., p. 503).  The prosecutor did not argue which person fired the shot that killed Robinson.

Woods was also charged under an accomplice liability theory with the murder of William Robinson.  (Respondent's Exhibit C, p. 8).  Officer Prichard testified the same at Woods' trial as he had at Morning's trial.  (Respondent's Ex. D, pp. 197-203).  Officer Prichard testified that the taller suspect held the victim against a utility pole.  (Id., pp. 202-03).  During closing argument, the prosecutor explained to the jury that under accomplice liability, it made no difference which defendant pulled the trigger.  (Id., p. 436).  The prosecutor also argued the following:

> William Robinson was killed with a forty-five caliber bullet.  Mary Harris's car was struck by a forty-five caliber bullet.  We don't know what kind of bullet went though the mouth of Keith Wilson because that bullet came out his neck.  But what was the only other bullet recovered by the police in the street?  It was a forty-five caliber bullet.  Who did Keith Wilson tell you was the one that started shooting at him first?  [Woods], the guy standing in front of the shorter fellow and [Woods] being the taller fellow.  What does James Prichard tell you?  The taller of the two guys had the guy up against the pole, and as he let the guy go, the guy fell.

(Id., pp. 445-46).

Woods argues that, because the prosecutor said during Morning's trial that the shorter suspect (Morning) had held Robinson up against the pole, and because the prosecutor said during Woods' trial that the taller suspect (Woods) had held Robinson, the prosecutor's theory of the crime was so inconsistent that it deprived him of due process.  (Motion, p. 14; Respondent's Exhibit F, p. 59).  The Missouri Court of Appeals rejected this claim:

> Although the State is not collaterally estopped from taking inconsistent positions nor required to argue mirror-image theories in separate trials of co-defendants, the use of inherently factually contradictory theories violates due process.  State v. Carter, 71 S.W. 3d 267, 271-72 (Mo. App. S.D. 2002).  In determining if inconsistent theories violate a defendant's right to due process and a fair trial, two factors are useful for analysis: 1) whether the alleged impropriety was so egregious that it fatally infected the trial, rendering it fundamentally unfair; and

- 22 -

2) whether the defendant demonstrated a reasonable probability that the verdict would have been different if the alleged impropriety had not occurred. Id. at 272.

Analyzing the first factor, we find that the State's contradictory representations during closing statements of the co-defendants' trials as to Officer Prichard's perception of relative size of the individual who was holding victim Robinson against the telephone pole compared to the other assailant was isolated and represented an anomaly when compared to the rest of the trial. Particularly, in light of the fact that Officer Prichard's testimony concerning the size of the assailants did not vary between the two trials, any error caused by the State's contradictory representations did not fatally infect [Woods'] trial nor render the entire trial fundamentally unfair. Id.

As to the second factor, we also find no reasonable probability that the outcome of [Woods'] trial would have been different. Id. The State presented the case to the jury on the theory of accomplice liability. Here, there was ample evidence on which the jury could find [Woods] guilty of Robinson's murder and Wilson's assault, based on the theory of accomplice liability. Id. (discussing elements of first-degree murder; in case based on accomplice theory of liability, jury must find that the defendant had a purpose to aid another in the commission of the crime); State v. Whittemore, 276 S.W. 3d 404, 407 (Mo. App. S.D. 2009)(discussing accomplice liability for first-degree assault; because Missouri eliminated the distinction between principals and accessories, all persons who act in concert to commit a crime are equally guilty). The motion court did not clearly err in concluding that the inconsistency was not so contradictory as to violate [Woods'] due process rights. Rule 29.15(k)(clear error); Carter, 71 S.W.3d at 271-72 (due process).

(Respondent's Exhibit L, pp. 15-16).

The Court finds that the decision of the Missouri Court of Appeals was reasonable and there was no due process violation. There was no inconsistency at the core of the prosecutor's cases against Woods and Morning. The record as a whole indicates that the prosecutor did not present inconsistent theories of the crime. Officer Prichard testified consistency at both trials that the taller suspect had held Robinson against a utility pole. At Morning's trial, however, the prosecutor asked the jury to recall that the officer testified that the smaller suspect had held Robinson against the telephone pole. (Respondent's Exhibit J/Transcript, p. 504). The Court assumes that the prosecutor had a mistaken recollection of Officer Prichard's testimony or simply misspoke by saying smaller when he meant to say taller.

Moreover, the issue of which suspect held Robinson against the pole is immaterial under the prosecutor's accomplice liability theory.  Here, there was ample evidence from which the jury could have found him guilty under an accomplice liability theory.  "The evidence at trial was that each of them approached Wilson and Robinson with guns visible, both opened fire on Wilson, both approached Robinson, both were observed with guns by the off duty police officer who heard shots fired and saw Robinson being held up against a pole, and both fled from the scene." (Respondent's Exhibit I, pp. 57-58).  At the trials of Woods and Morning, "[t]he perpetrators were the same two individuals, the evidence and theories in both cases were that the crimes were committed by the two persons acting in concert, there was evidence that both had guns and had fired their guns, and the identity of the person holding Robinson up against the pole was not critical to the criminal liability of either participant." (Id. at 59).

The Court further finds that Woods' claim that his counsel was ineffective for failing to object on these grounds lack merits.  To state an ineffective assistance of counsel claim for failing to object, "[t]he movant must prove that a failure to object was not strategic and that the failure to object was prejudicial." State v. Clay, 975 S.W.2d 121, 135 (Mo. 1998)(citing State v. Tokar, 918 S.W.2d 753, 768 (Mo. banc 1996)).  Woods is unable to demonstrate prejudice from defense counsel's failure to make a meritless objection. Johnson v. Bowersox, 4:10CV92 LMB, 2013 WL 253232, at *6 (E.D. Mo. Jan. 23, 2013); see Clay, 975 S.W.2d at 135 (Mo. 1998)("Counsel will not be deemed ineffective for failing to make nonmeritorious objections."); Rodriguez v. United States, 17 F.3d 225, 226 (8th Cir. 1994)("counsel's failure to advance a meritless argument cannot constitute ineffective assistance"). Ground 6 is denied.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner Henry Woods' Petition under 28 U.S.C. §2254 for Writ of Habeas Corpus By a Person in State Custody [1] is **DENIED**.

**IT IS FURTHER ORDERED** that because Petitioner cannot make a substantial showing of the  denial of a constitutional right, the Court will not issue a certificate of appealability. See Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997), cert. denied, 525 U.S. 834, 119 S. Ct. 89, 142 L. Ed. 2d 70 (1998).

A judgment dismissing this case is filed herewith.

Dated this 29th day of March, 2013.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE